PPL CORPORATION & SUBSIDIARIES, PETITIONER *v.*
COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket No. 25393–07.          Filed September 9, 2010.

*Held*: The United Kingdom windfall tax enacted on July 2, 1997, and imposed on certain British utilities is a creditable tax under sec. 901, I.R.C.

304

*Richard E. May*, *Mark B. Bierbower*, and *Timothy L. Jacobs*, for petitioner.

*Melissa D. Arndt*, *Allan E. Lang*, *Michael C. Prindible*, and *R. Scott Shieldes*, for respondent.

HALPERN, *Judge*: PPL Corp. (petitioner) is the common parent of an affiliated group of corporations (the group) making a consolidated return of income. By notice of deficiency, respondent determined a deficiency of $10,196,874 in the group's Federal income tax for its 1997 taxable (calendar) year and also denied a claim for refund of $786,804. The issues for decision are whether respondent properly (1) denied the claim for the refund, which is related to the creditability of the United Kingdom (U.K.) windfall tax paid by petitioner's indirect U.K. subsidiary (the windfall tax issue), (2) included as dividend income a distribution that petitioner received from the same indirect U.K. subsidiary, but which, within a few days, the subsidiary rescinded and petitioner repaid (the dividend rescission issue), and (3) denied depreciation deductions that petitioner's U.S. subsidiary claimed for street and area lighting assets. We disposed of the third issue in a previous report, *PPL Corp. & Subs. v. Commissioner*, 135 T.C. 176 (2010), and we dispose of the remaining issues here.

Unless otherwise stated, all section references are to the Internal Revenue Code in effect for 1997, and all Rule references are to the Tax Court Rules of Practice and Procedure. With respect to the two issues before us here, petitioner bears the burden of proof. See Rule 142(a). [1]

## FINDINGS OF FACT

### *Stipulations*

The parties have entered into a first, second, and third stipulation of facts. The facts stipulated are so found. The stipulations, with accompanying exhibits, are incorporated herein by this reference.

---

[1] Petitioner has not raised the issue of sec. 7491(a), which shifts the burden of proof to the Commissioner in certain situations. We conclude that sec. 7491(a) does not apply because petitioner has not produced any evidence that it has satisfied the preconditions for its application. See sec. 7491(a)(2).

*Petitioner's Business and Its U.K. Operation*

Petitioner is a Pennsylvania corporation that was known during 1997 as PP&L Resources, Inc. It is a global energy company. Through its subsidiaries, it produces electricity, sells wholesale and retail electricity, and delivers electricity to customers. It provides energy services in the United States (in the Mid-Atlantic and the Northeast) and in the United Kingdom. During 1997, South Western Electricity plc (SWEB), a U.K. private limited liability company, was petitioner's indirect subsidiary.[2] Its principal activities at the time included the distribution of electricity. It delivered electricity to approximately 1.5 million customers in its 5,560-square-mile service area from Bristol and Bath to Land's End in Cornwall. SWEB also owned electricity-generating assets.

*Privatization of U.K. Companies*

The Conservative Party won control of the U.K. Parliament in the 1979 elections. It retained control through May 1997, under the leadership of Margaret Thatcher and John Major.

Between 1979 and 1983, the Conservatives privatized mostly companies that were not monopolies (e.g., manufacturing companies) and, for that reason, did not require specific economic regulation. Between 1984 and 1996, however, the U.K. Government privatized more than 50 Government-owned companies, many of which were monopolies.

The U.K. Government privatized those companies largely through public flotations (share offerings) at fixed price offers, which involved the transfer of those Government-owned enterprises to new public limited companies (plcs), followed by what was essentially a sale of all or some of the shares in the new plcs to the public.[3] The plcs then became

---

[2] SWEB was originally incorporated as a U.K. public limited liability company in 1987, but, as described *infra*, it was privatized in 1990. The appendix shows SWEB's relationship to petitioner in 1997.

[3] The U.K. Government hired investment banks and other advisers to assist it in setting the initial share prices, structuring the offers, and marketing the shares to investors. The new plcs were not subject to a gains tax on transfers of stock to the general public, a result made possible by an amendment to the then-existing U.K. law.

Under sec. 171 of the U.K. Taxation of Chargeable Gains Act, 1992 (TCGA), companies within a group (generally, a parent and its 75-percent-owned subsidiaries) may transfer assets between members of the group without incurring a capital gains charge. The effect of TCGA sec. 171 is to defer the chargeable gain on asset appreciation until a group member transfers the asset outside the group, at which point the gain becomes chargeable to that transferor. Under the TCGA as originally enacted, however, the transfer outside the group of the *stock* of a group member holding an appreciated asset would not trigger any capital gains charge to the trans-

publicly traded companies listed on the London Stock Exchange. In most cases, the floated shares opened for trading at a substantial premium over the price the flotation investors paid for the shares.

In December 1990, the U.K. Government privatized 12 regional electric companies (RECs), including SWEB. The ordinary shares of each REC were offered to the public at £2.40 per share in connection with the flotation of those shares.

The 32 U.K. Government-owned companies that were privatized and that ultimately became liable for the windfall tax (the privatized utilities or windfall tax companies) and the years in which they were privatized are as follows:

| *Company* | *Year* |
|---|---|
| 50.2 percent of British Telecommunications plc (British Telecom) | 1984 |
| British Gas plc | 1986 |
| British Airports Authority | 1987 |
| 10 water and sewerage companies (the WASCs) | 1989 |
| The 12 RECs | 1990 |
| 60 percent of National Power plc and Powergen plc (the generating companies) | 1991 |
| Scottish Power plc and Scottish Hydro-Electric plc (the Scottish electricity companies) | 1991 |
| Northern Ireland Electricity (NIE) | 1993 |
| Railtrack plc (Railtrack) | 1996 |
| 88.5 percent of British Energy plc (British Energy) which owned U.K. nuclear generating stations) | 1996 |

*Regulation of the Windfall Tax Companies*

The Electricity Act of 1989, c. 29, sec. 1, created the position of U.K. Director General of Electricity Supply, a position that Professor Stephen C. Littlechild (Professor Littlechild) held from its creation in 1989 through 1998. [4]

---

feror. (The nongroup transferee, meanwhile, would receive a basis in the stock that would reflect the value of the underlying asset.) TCGA sec. 179 was enacted to make the tax consequences of the stock transfer similar to those of the asset transfer, although only if the transfer of the stock of the group member holding the asset occurred within 6 years of that member's acquisition of the asset. Because the transfers of the stock of the privatized utilities to the general public pursuant to the flotations of that stock would have triggered the application of TCGA sec. 179 and taxation of the appreciation inherent in the assets the companies received from the various U.K. Government-owned enterprises, Parliament specifically exempted the privatization share transfers from the application of that provision.

[4] Professor Littlechild was professor of commerce and head of the Department of Industrial Economics and Business Studies, University of Birmingham (on leave, 1989 to 1994) from 1975 to 1994 (and honorary professor from 1994 until 2004).

Before that appointment, in 1983, the U.K. Secretary of State asked Professor Littlechild for his advice on how to regulate British Telecom in the light of its impending privatization. Professor Littlechild recommended a regulatory scheme which regulated prices rather than, as in the United States, maximum profits or rates of return. The premise of the scheme, which became known as "RPI − X",[5] was that, if the Government fixed prices (but not profits) for a set number of years, the privatized companies would have an incentive to reduce costs to maximize profits during that period. Prices would be reset (presumably downward) at the start of the next regulatory period, to garner for consumers the fruits of the prior period's cost reductions. Profits might in a sense become excessive during any regulatory period (because a company achieved greater-than-anticipated savings and there was no mechanism for mid-period correction), but balance would be reestablished at the start of the next period. The goal was to increase efficiency, encourage competition, and protect consumers. Under RPI − X, prices were not allowed to increase during the regulatory period, except to allow for inflation (i.e., increases in RPI) less an amount (the X factor, which did not vary during the period) intended to reflect expected, increasing efficiency.

The U.K. Government set the X factors for the first regulatory periods, just before the initial privatization, to be effective for what was, in most cases, the 5-year period after privatization. Industry regulators subsequently reset the X factors, typically every 4 or 5 years. In some cases, particularly where investment requirements were high (e.g., in the case of companies that had underinvested while under public ownership), the X factor might be positive (RPI + X). That was the case for most of the RECs and WASCs.

Each of the regulatory bodies for the privatized utilities followed the RPI − X regulatory method, which was adopted for 29 of the 32 windfall tax companies, the exceptions being the generating companies. On March 31, 1990, the RPI − X methodology as applied to the RECs came into effect for the 5-year period ending March 31, 1995. As noted *supra*, because the RECs were in need of large capital expenditures

---

[5] RPI, which stands for retail price index, is comparable to the CPI (consumer price index) used for various purposes in the United States.

during the initial 5-year period, the U.K. Government set price controls for the RECs in the form of RPI + X; i.e., it provided for annual increases in electricity distribution charges above the rate of inflation rather than reductions in those charges.

*Utility Profits, Share Prices, and Executive Compensation During the Initial Postprivatization Period*

During the initial postprivatization period (the initial period), the privatized utilities were able to increase efficiency and reduce operating costs to a greater degree than had been expected when the initial price controls were established. That ability led to higher-than-anticipated profits,[6] which, in turn, led to higher-than-anticipated dividends and share price increases for the privatized utilities. The large profits, dividends, and share price increases resulted in sharply increased compensation for utility directors and executives, which, in some cases, arose through their share ownership and through bonus schemes. The popular press referred to those executives as "fat cats".

The public viewed the privatized utilities' initial period profits as excessive in relation to their flotation values. It also viewed the initial period compensation paid to the directors and executives of those companies as excessive. Those concerns, as well as the increases in dividends and share prices, resulted in considerable public pressure on the utility industry regulators to intervene and take action that would result immediately in lower prices, before the expiration of the initial 5-year period. But because the incentive for increased efficiency (and, ultimately, lower prices) depended on the regulators' not intervening until the end of the defined price control period, the regulators resisted that pressure and did not act until the end of the initial period, at which point they did tighten price controls and thereby transfer the benefit of reduced prices to utility customers. Despite those price adjustments, the public retained a strong feeling that the privatized utilities had unduly profited from privatization

---

[6] Among the privatized utilities, the RECs and the WASCs were particularly profitable during the initial period in that they recovered nearly all (over 90 percent for the WASCs and over 80 percent for the RECs) of their shareholders' initial investment at flotation within the first 4 years.

and that customers had not shared equally in the gains therefrom.

*Development of the Windfall Tax*

Although the Labour Party had been fundamentally opposed to privatization, particularly with respect to the utilities, by 1992 the party reasoned that, because it would be costly and, given that much of the voting public had embraced share ownership, potentially unpopular, re-nationalization of those companies (when the party regained control of the Government) was unrealistic. The issue, then, was how the party might best channel the public concerns into developing policy.

As early as 1992, the British press reported that the policy of an incoming Labour Party might include "a 'windfall' tax on the profits of privatized utilities such as gas and electricity." By 1994 the idea of a windfall tax had become a regular feature in all Labour Party speeches and programs, and, in 1997, the party campaigned on a platform promising that it would (1) impose a windfall tax on the previously privatized utilities and (2) implement a welfare-to-work youth employment training program that the windfall tax would fund. Specifically, the Labour Party's 1997 Election Manifesto contained the following promise:

We will introduce a Budget * * * to begin the task of equipping the British economy and reforming the welfare state to get young people and the long-term unemployed back to work. This welfare-to-work programme will be funded by a windfall levy on the excess profits of the privatised utilities * * *.

In May 1996, before the issuance of that manifesto, certain members of the Labour Party's shadow treasury team, which included Geoffrey Robinson (Mr. Robinson), a Member of Parliament, began designing the U.K. windfall tax legislation that the party would introduce to Parliament in the likely event that it won the 1997 election. To that end, Mr. Robinson commissioned members of the tax consulting firm Arthur Andersen (the Andersen team) to assist the Labour Party's shadow treasury team in developing the tax. The Andersen team consisted principally of Stephen Hailey, Christopher Osborne (Mr. Osborne), and Christopher Wales (Dr. Wales). The tax that the Andersen team devised was essentially the

windfall tax that Parliament enacted in July 1997. Mr. Osborne and Dr. Wales were the most involved members of the Andersen team.

During their initial consideration of the design of the windfall tax, the Andersen team proposed three "simple" and three "complex" solutions for structuring the tax. The "simple" solutions were to tax either (1) turnover (gross receipts), (2) assets, or (3) profits. The "complex" solutions were to tax (1) excess profits, (2) excess shareholder returns, or (3) a "windfall" amount. The team members rejected the three "simple" solutions and the first two "complex" solutions for a variety of reasons. For example, they considered that a straightforward tax on profits, if prospective, would pose a risk of financial manipulation by the target companies (and, therefore, uncertainty as to its yield), a risk of public perception that it would compromise existing corporate tax reliefs, and, if retrospective, a risk of criticism that it constituted a second tax on the same profits. And although Mr. Robinson and the Andersen team considered that there was ample rationale for a straightforward tax on either excess profits or excess shareholder returns, they concluded that the negative aspects (e.g., the difficulty in computing the "excess" amounts, the need for a retrospective tax to be assured of raising a target amount, and, in the case of a tax on excess shareholder returns, the likelihood of taxing the wrong shareholders, i.e., shareholders who did not realize those returns) outweighed the positive ones.

As a result of the perceived difficulties with the other approaches, Mr. Robinson and the Andersen team settled on the idea of a tax that would be a one-time (or, in U.K. parlance, a "one-off") tax on the "windfall" to the privatized utilities on privatization. The approach would be to impute a value to each company at privatization, using an appropriate price-to-earnings ratio for each company's profits during the first 5 years after flotation, recognize the "windfall" (the difference between the imputed value and the flotation price) as value forgone by taxpayers, and tax the privatized utilities on that "windfall" using established principles from capital gains tax legislation.[7] They reasoned that

_____
[7] In November 1996, in a presentation to Gordon Brown (Labour's next Chancellor of the Exchequer) and the Labour Party's shadow treasury team, the Andersen team set forth the aver-
Continued

such a tax would factor in the privatized utilities' "excess" profitability, the discount on privatization, the unanticipated efficiency gains, and the perceived weakness of the initial regulatory regime.

In November 1996, the foregoing proposal was reviewed and approved by Gordon Brown (who became Chancellor of the Exchequer when Labour returned to power in 1997) and the Labour Party's shadow treasury team, and, after the Labour Party regained power in 1997, by the U.K. Treasury Department, Inland Revenue, and the Parliamentary drafters (who drafted the actual legislative language), after which the draft legislation was disseminated to members of Parliament and enacted in July 1997.

*Description of the Windfall Tax*

On July 31, 1997, Parliament enacted the windfall tax. It constituted part I of chapter 58, Finance (No. 2) Act 1997 (the Act), and provided, in clause 1, as follows:

> 1.—(1) Every company which, on 2nd July 1997, was benefitting from a windfall from the flotation of an undertaking whose privatisation involved the imposition of economic regulation shall be charged with a tax (to be known as the "windfall tax") on the amount of that windfall.
>
> (2) Windfall tax shall be charged at the rate of 23 per cent.
>
> (3) Schedule 1 to this Act (which sets out how to quantify the windfall from which a company was benefitting on 2nd July 1997) shall have effect.

Clause 2 makes clear that the windfall tax is to apply to the 32 privatized utilities, clause 3 provides for the administration of the tax by the Commissioners of Inland Revenue, clause 4 covers the relationship between the windfall tax and profit-related pay schemes under the then-existing U.K. law, and clause 5 sets forth the definitions of terms used in part I.

Paragraphs 1 and 2 of schedule 1, referred to in clause 1(3), provide in pertinent part as follows:

---

age price-to-earnings ratios for the various privatized utility groups during the first 5 years after privatization, which ranged from a high of 12.7 after-tax and 9.4 pre-tax (both for the Scottish Electricity companies) to a low of 9.4 after-tax (for the WASCs) and 7.3 pre-tax (for the RECs). The presentation also set forth the potential revenue yield from using price-to-pre-tax earnings ratios of 6 through 8 to ascertain the imputed values of the companies and showed that a potential revenue yield of £6.4 billion could be achieved by using for that purpose either a pre-tax ratio of 6 or an after-tax ratio of 8.25 coupled with a 33-percent windfall tax rate on the excess of the imputed value over the flotation price.

1.—(1) * * * where a company was benefitting on 2nd July 1997 from a windfall from the flotation of an undertaking whose privatisation involved the imposition of economic regulation, the amount of that windfall shall be taken for the purposes of this Part to be the excess (if any) of the amount specified in sub-paragraph (2)(a) below over the amount specified in sub-paragraph (2)(b) below.

(2) Those amounts are the following amounts * * *, that is to say—

(a) the value in profit-making terms of the disposal made on the occasion of the company's flotation; and

(b) the value which for privatisation purposes was put on that disposal.

### *Value of a disposal in profit-making terms*

2.—(1) * * * the value in profit-making terms of the disposal made on the occasion of a company's flotation is the amount produced by multiplying the average annual profit for the company's initial period by the applicable price-to-earnings ratio.

(2) For the purposes of this paragraph the average annual profit for a company's initial period is the amount produced by the following formula—

$$A = 365 \times P/D$$

Where—

A is the average annual profit for the company's initial period;

P is the amount * * * of the total profits for the company's initial period; and

D is the number of days in the company's initial period.

(3) For the purposes of this paragraph the applicable price-to-earnings ratio is 9.

Paragraph 3 defines "value put on a disposal for privatisation purposes"; i.e., the flotation value. Paragraph 4 provides for an appropriate percentage reduction of a company's "value in profit-making terms" and its flotation value where less than 85 percent of the company's ordinary share capital was "offered for disposal on the occasion of the company's flotation." Paragraph 5 sets forth the criteria for determining a company's "total profits for a company's initial period" and generally provides that those profits are its after-tax profits for financial reporting purposes as determined under relevant provisions of the U.K. Companies Act 1985.[8] Paragraph 6 defines the term "initial period" in relation to a company as the period encompassing the company's 4 financial years after flotation or such lesser period of exist-

---

[8] The parties stipulate that profit for a windfall tax company's initial period was equal to the company's "profit on ordinary activities after tax" as determined under U.K. financial accounting principles and standards and as shown in the company's profit and loss accounts prepared in accordance with the U.K. Companies Act of 1985, as amended.

ence for companies operating for less than 4 financial years after privatization and before April 1, 1997.[9] Paragraph 7 provides for the apportionment of the windfall amount subject to tax between companies that previously had been a single privatized company. Lastly, paragraph 8 defines the term "financial year" and other terms for purposes of the windfall tax legislation.

The Act required that affected companies pay the windfall tax in two installments: one-half on or before December 1, 1997, and the other half on or before December 1, 1998.

*Public Statements Regarding the Windfall Tax*

On July 2, 1997, Gordon Brown, then Chancellor of the Exchequer, gave the Budget Speech announcing the windfall tax, and he described the windfall tax as follows:

Our reform to the welfare state—and the programme to move the unemployed from welfare to work—is funded by a new and one-off windfall tax on the excess profits of the privatised utilities.

\* \* \* \* \* \* \*

In determining the details of the tax, I believe I have struck a fair balance between recognising the position of the utilities today and their under-valuation and under-regulation at the time of privatisation.

The windfall tax will be related to the excessively high profits made under the initial regime.

A company's tax bill will be based on the difference between the value that was placed on it at privatisation, and a more realistic market valuation based on its after-tax profits for up to the first 4 full accounting years following privatisation.

Also on July 2, 1997, Inland Revenue issued an announcement describing the tax as follows:

The Chancellor today announced the introduction of the proposed windfall tax on the excess profits of the privatised utilities. The one-off tax will apply to companies privatised by flotation and regulated by statute. The tax will be charged at a rate of 23 per cent on the difference between company value, calculated by reference to profits over a period of up to four years following privatisation, and the value placed on the company at the time of flotation. The expected yield is around 5.2 billion Pounds.

The Inland Revenue announcement also stated that the price-to-earnings ratio of 9 "approximates to the lowest aver-

---

[9] From this point forward, the term "initial period" refers to the 4-year windfall tax initial period rather than the 5-year initial postprivatization period under the RPI − X regulatory regime.

age price/earnings ratio of the taxpaying companies during the relevant periods, grouped by sector."

Around that same time, Her Majesty's Treasury issued a publication entitled "Explanatory Notes: Summer Finance Bill 1997", which describes in detail the various clauses of the windfall tax, and which contains a section entitled "Background", stating:

The introduction of the windfall tax is in accordance with the commitment in the Government's Election Manifesto to raise a tax on the excess profits of the privatised utilities.

The profits made by these companies in the years following privatisation were excessive when considered as a return on the value placed on the companies at the time of their privatisation by flotation. This is because the companies were sold too cheaply and regulation in the relevant periods was too lax.

The windfall tax will raise around £5.2 billion and fund the Government's welfare to work programme.

*Parliamentary Debate Preceding Enactment of the Windfall Tax*

Mr. Robinson, in opening the debate in the House of Commons on the windfall tax legislation, offered the following introductory observations:

Clause 1 heads a group of provisions that together introduce the windfall tax, thus meeting the commitment that we made in our election manifesto to introduce a windfall levy on the excess profits of the privatised utilities. Those companies were sold too cheaply, so the taxpayer got a bad deal. Their initial regulation in the period immediately following privatisation was too lax, so the customer got a bad deal.

As a result, the companies were able to make profits that represented an excessive return on the value placed on them at the time of their flotation. We are now putting right the failures of the past by levying a one-off tax. The yield of around £5.2 billion will fund our welfare-to-work programme, and the new deal that we have announced for the young long-term unemployed and schools.

Clause 1 provides a one-off charge, set at a rate of 23 per cent. It also gives effect to schedule 1, which will be debated in Standing Committee. It may be helpful if I set the clause in context by explaining briefly how the windfall tax works.

Windfall tax is charged on the difference between the value of the company, calculated by reference to the profits made in the initial period after privatisation, and the value placed on the company at the time of privatisation. The value of the company is calculated by multiplying the average annual profit after tax for, normally, the first four financial years

after flotation, by a price-to-earnings ratio of nine. That ratio approximates to the lowest average * * * sectoral price-to-earnings ratio of the companies liable to the tax. * * *

The Conservative Party Shadow Chancellor of the Exchequer, Peter Lilley, MP (Mr. Lilley), summarized his party's opposition to the windfall tax, and, in particular, clause 1 imposing the tax, as follows:

We have four major criticisms of the clause and the windfall tax that it initiates. First, the clause makes it clear that the tax will not be borne by the so-called fat cats and speculators, criticisms of whom justified its introduction. Secondly, it makes no meaningful attempt to define what is a windfall and should therefore bear the tax. Thirdly, it increases instead of reduces cost to customers; any improved profitability should be passed on to customers in the form of lower prices. Finally, it is retrospective, arbitrary and symptomatic of the Government's belief in arbitrary government, rather than in government by known and predictable rules.

Mr. Lilley's comments during the debate illustrate his understanding of how the tax would affect the privatized utilities:

They [the government] have taken average profits over four years after flotation. If those profits exceed one ninth of the flotation value, the company will pay windfall tax on the excess. * * *

And further:

Essentially, the windfall tax boils down to a tax on success. Companies that failed to improve their profitability over the said period will pay much less or even no windfall tax. * * *

Other members of the Conservative Party repeated the idea that the windfall tax was a tax on profits or on success.

Several Labour Party members defended the tax as a legitimate method of recouping the difference between what should have been charged for the privatized utilities at the time of the various privatizations and the actual flotation prices. For example, one such member, Mr. Hancock, observed:

The overwhelming majority of people have embraced the tax because most think that they were ripped off in the first place when the companies were sold. The companies were sold at hopelessly undervalued prices at a time when most people felt that the companies were better and safer in the hands of the public sector. The legitimacy of the tax among the general

public is that they feel that they are getting back what they should have had in the first place.

Another, Mr. Stevenson, echoed Mr. Hancock's remarks:

I asked the Library to do some research on the difference between the proceeds from privatization of the utilities, not including the railways, and their stock market share price the minute they were floated. I asked the Library to tot up the difference. It was almost £6 billion at the outset of privatisation and it has increased over the years. So the snapshot figure of £6 billion by which the Government undersold public assets, and therefore robbed the public, is a conservative estimate.

## Overall Effect of the Windfall Tax on the Windfall Tax Companies

Thirty-one of the thirty-two windfall tax companies had a windfall tax liability. None of the 31 companies that paid windfall tax had a windfall tax liability that exceeded its total profits over its initial period. Twenty-nine of those thirty-two companies had initial periods of 4 full financial years. Twenty-seven of those twenty-nine companies had initial periods consisting of 1,461 days, i.e., three 365-day years and one 366-day (leap) year. The other 2 of those 29 companies had initial periods of 1,456 days and 1,463 days,[10] respectively. The remaining three companies had initial periods of less than 4 full financial years, consisting of 1,380 days, 316 days, and (in the case of British Energy, which because of low initial profits, paid no windfall tax) 260 days, respectively.

## Effect of the Windfall Tax on SWEB

Before the enactment of the windfall tax, SWEB met with members of the shadow treasury team (which included Mr. Robinson) and the Andersen team in an effort to influence the development of the windfall tax. SWEB's then treasurer, Charl Oösthuizen (Mr. Oösthuizen), was the SWEB officer principally engaged in that effort. Upon the announcement of the windfall tax, SWEB realized that its liability for the tax would greatly exceed its prior estimates thereof, and it investigated ways of reducing that liability. SWEB determined that it could reduce its windfall tax liability if it could reduce its

---

[10] The parties stipulated an initial period of 1,463 days, although that would seem to exceed 4 years, even taking into account a leap year.

earnings for the 4-year initial period. To that end, SWEB identified a theretofore unidentified liability of £12 million for tree-trimming costs (trees interfered with its distribution network) that SWEB should have taken account of in determining its earnings for its fiscal year ended March 31, 1995. SWEB's outside auditor approved a restatement of its 1995 earnings and, after an initial objection, Inland Revenue did as well.

SWEB filed its windfall tax return with Inland Revenue on November 7, 1997, and paid its £90,419,265 windfall tax liability (which was based on 4 full financial years totaling 1,461 days), as required, in two installments, on December 1, 1997 and 1998. The first installment was paid 1 day after the close of SWEB's tax year (for U.S. Federal income tax purposes) ending November 30, 1997.

## OPINION

### I. *The Windfall Tax Issue*

#### A. *Principles of Creditability*

Pursuant to section 901(a) and (b)(1), a domestic corporation may claim a foreign tax credit against its Federal income tax liability for "the amount of any income, war profits, and excess profits taxes paid or accrued during the taxable year to any foreign country". We must decide whether the windfall tax constitutes a creditable income or excess profits tax under section 901.

In *Phillips Petroleum Co. v. Commissioner*, 104 T.C. 256, 283–284 (1995), we described the background, purpose, and function of the foreign tax credit provisions of the Internal Revenue Code as follows:

The foreign tax credit provisions were enacted primarily to mitigate the heavy burden of double taxation for U.S. corporations operating abroad who were subject to taxation in both the United States and foreign countries. *Burnet v. Chicago Portrait Co.*, 285 U.S. 1, 9 (1932); *F.W. Woolworth Co. v. Commissioner*, 54 T.C. 1233, 1257 (1970). These provisions were originally designed to produce uniformity of tax burdens among U.S. taxpayers, irrespective of whether they were engaged in business abroad or in the United States. H. Rept. 1337, 83d Cong., 2d Sess. 76 (1954). A secondary objective of the foreign tax credit provisions was to encourage, or at least not to discourage, American foreign trade. H.R. Rept. 767, 65th

Cong., 2d Sess. (1918), 1939–1 C.B. (Part 2) 86, 93; *Commissioner v. American Metal Co.*, 221 F.2d 134, 136 (2d Cir. 1955), affg. 19 T.C. 879 (1953).

Taxes imposed by the government of any foreign country were initially fully deductible in computing net taxable income, pursuant to our income tax law of 1913. Revenue Act of 1913, ch. 16, 38 Stat. 114. Specific foreign taxes became creditable pursuant to the Revenue Act of 1918. The foreign taxes that are presently creditable pursuant to section 901, specifically, income, war profits, and excess profits taxes, have remained unchanged and are the same taxes that were creditable in 1918. Revenue Act of 1918, ch. 18, sec. 222(a)(1), 40 Stat. 1073.

The definition of income, war profits, and excess profits taxes has evolved case by case. The temporary and final regulations, adopted relatively recently, outline the guiding principles established by prior case law. * * *

The Supreme Court in *Biddle v. Commissioner*, 302 U.S. 573, 579 (1938), established the principle, uniformly followed in subsequent caselaw and enshrined in the regulations, that, in deciding whether a foreign tax is an "income tax" for purposes of section 901, the term "income tax" will be given meaning by referring to the U.S. income tax system and measuring the foreign tax against the essential features of that system:

The phrase "income taxes paid," as used in our own revenue laws, has for most practical purposes a well understood meaning * * *. It is that meaning which must be attributed to it * * *.

The final regulations referred to in *Phillips Petroleum* are the regulations that were issued in 1983, were in effect in 1997 (the year in issue), and remain in effect today (sometimes, the 1983 regulations).

Section 1.901–2, Income Tax Regs., is entitled "Income, war profits, or excess profits tax paid or accrued." Paragraph (a) thereof is entitled "*Definition of income, war profits, or excess profits tax*", and, in pertinent part, it provides as follows (adopting the term "income tax" to refer to an "income", "war", or "excess profits" tax):

(1) *In general*. * * * A foreign levy is an income tax if and only if—

(i) It is a tax; and

(ii) The predominant character of that tax is that of an income tax in the U.S. sense.

Paragraph (a) further provides that, with exceptions not relevant to this case, "a tax either is or is not an income tax, in its entirety, for all persons subject to the tax."

In pertinent part, section 1.901–2(a)(3), Income Tax Regs., defines the term "predominant character" as follows: "The predominant character of a foreign tax is that of an income tax in the U.S. sense * * * [i]f, within the meaning of paragraph (b)(1) of this section, the foreign tax is likely to reach net gain in the normal circumstances in which it applies".

In pertinent part, section 1.901–2(b)(1), Income Tax Regs., provides:

A foreign tax is likely to reach net gain in the normal circumstances in which it applies if and only if the tax, judged on the basis of its predominant character, satisfies each of the realization, gross receipts, and net income requirements set forth in paragraphs (b)(2), (b)(3) and (b)(4), respectively, of this section.

Pursuant to section 1.901–2(b)(2)(i), Income Tax Regs. (as pertinent to this case), a foreign tax satisfies the realization requirement:

if, judged on the basis of its predominant character, it is imposed * * * [u]pon or subsequent to the occurrence of events ("realization events") that would result in the realization of income under the income tax provisions of the Internal Revenue Code * * *

Pursuant to section 1.901–2(b)(3)(i), Income Tax Regs. (as pertinent to this case), a foreign tax satisfies the gross receipts requirement "if, judged on the basis of its predominant character, it is imposed on the basis of * * * [g]ross receipts".

Pursuant to section 1.901–2(b)(4)(i), Income Tax Regs., a foreign tax satisfies the net income requirement:

if, judged on the basis of its predominant character, the base of the tax is computed by reducing gross receipts * * * to permit—
  (A) Recovery of the significant costs and expenses * * * attributable * * * to such gross receipts; or
  (B) Recovery of such significant costs and expenses computed under a method that is likely to * * * [approximate or be greater than] recovery of such significant costs and expenses.

Section 1.901–2(b)(4)(i), Income Tax Regs., further provides:

A foreign tax law permits recovery of significant costs and expenses even if such costs and expenses are recovered at a different time than they would be if the Internal Revenue Code applied,[11] unless the time of

---

[11] E.g., items deductible under the Internal Revenue Code and capitalized and amortized under the foreign tax system.

recovery is such that under the circumstances there is effectively a denial of such recovery. * * * A foreign tax law that does not permit recovery of one or more significant costs or expenses, but that provides allowances that effectively compensate for nonrecovery of such significant costs or expenses, is considered to permit recovery of such costs or expenses. * * * A foreign tax whose base is gross receipts or gross income does not satisfy the net income requirement except in the rare situation where that tax is almost certain to reach some net gain in the normal circumstances in which it applies because costs and expenses will almost never be so high as to offset gross receipts or gross income, respectively, and the rate of the tax is such that after the tax is paid persons subject to the tax are almost certain to have net gain. * * *

The Secretary first adopted the "predominant character" standard in the 1983 regulations. In the preamble to those regulations (the preamble), the Secretary stated that the standard:

adopts the criterion for creditability set forth in *Inland Steel Company v. U.S.*, 677 F.2d 72 (Ct. Cl. 1982), *Bank of America National Trust and Savings Association v. U.S.*, 459 F.2d 513 (Ct. Cl. 1972), and *Bank of America National Trust and Savings Association v. Commissioner*, 61 T.C. 752 (1974). * * * [T.D. 7918, 1983–2 C.B. 113, 114.]

In the cases the Secretary cited in the preamble and in other, more recent, cases, the issue or test regarding the status of a foreign tax as a creditable income tax appears to be whether the foreign tax in question is designed to and does in fact reach net gain in the normal circumstances in which it applies. Thus, in *Bank of Am. Natl. Trust & Sav. Association v. United States*, 198 Ct. Cl. 263, 274, 459 F.2d 513, 519 (1972) (Bank of America I), which the Secretary cites in the preamble, the Court of Claims, in considering the creditability of a gross income tax that, on its face, was not a tax on net income or gain, concluded that such a tax could be creditable under certain circumstances:

We do not, however, consider it all-decisive whether the foreign income tax is labeled a gross income or a net income tax, or whether it specifically allows the deduction or exclusion of the costs or expenses of realizing the profit. The important thing is whether the other country is attempting to reach some net gain, not the form in which it shapes the income tax or the name it gives. In certain situations a levy can in reality be directed at net gain even though it is imposed squarely on gross income. That would be the case if it were clear that the costs, expenses, or losses incurred in making the gain would, in all probability, always (or almost so) be the lesser part of the gross income. In that situation there would

always (or almost so) be some net gain remaining, and the assessment would fall ultimately upon that profit.[12]

In *Inland Steel Co. v. United States*, 230 Ct. Cl. 314, 325, 677 F.2d 72, 80 (1982), also cited in the preamble, the Court of Claims, relying on its earlier decision in Bank of America I, emphasized the purpose of the foreign country in designing the tax to reach net gain: [13]

To qualify as an income tax in the United States sense, the foreign country must have made an attempt always to reach some net gain in the normal circumstances in which the tax applies. * * * The label and form of the foreign tax is not determinative. * * *

In *Bank of Am. Natl. Trust & Sav. Association v. Commissioner*, 61 T.C. 752, 760 (1974), affd. without published opinion 538 F.2d 334 (9th Cir. 1976), the third case the Secretary cites in the preamble, we described the analysis of the Court of Claims in Bank of America I as "[distilling]" the governing test to determine whether a foreign income tax qualifies as a creditable income tax within the meaning of section 901(b)(1); i.e., whether the tax was "designed to fall on some net gain or profit". That test, we added, "is the proper one to apply". *Id.*

Moreover, courts have construed the 1983 regulations in a manner consistent with the analysis in Bank of America I. For example, the Court of Appeals for the Second Circuit, in *Texasgulf, Inc. v. Commissioner*, 172 F.3d 209 (2d Cir. 1999) (Texasgulf II), affg. 107 T.C. 51 (1996) (Texasgulf I), considered the creditability of the Ontario Mining Tax (OMT), which imposed a graduated tax on Ontario mines to the extent that "profit", as defined for OMT purposes, exceeded a statutory exemption. In determining "profit" for OMT purposes, taxpayers were allowed to deduct "an allowance for profit in respect of processing" (processing allowance) in lieu of certain expenses that were attributable to OMT gross receipts but

---

[12] The test the Court of Claims adopted for the creditability of a foreign gross income tax (the virtual certainty of net gain) is specifically incorporated in the regulations. See sec. 1.901–2(b)(4)(i), Income Tax Regs., quoted *supra*.

[13] As the Court of Appeals for the Second Circuit stated in *Texasgulf, Inc. v. Commissioner*, 172 F.3d 209, 216 (2d Cir. 1999) (Texasgulf II), affg. 107 T.C. 51 (1996) (Texasgulf I), the preamble to the 1983 regulations "reaffirms *Inland Steel's* general focus upon the extent to which a tax reaches net gain". In Texasgulf II, the Court of Appeals found creditable under the predominant character standard in the 1983 regulations a tax, the Ontario Mining Tax, that the Court of Claims, in *Inland Steel Co. v. United States*, 230 Ct. Cl. 314, 677 F.2d 72 (1982), had found noncreditable before the promulgation of those regulations. See discussion *infra*.

that were not recoverable under the tax (nonrecoverable expenses). The taxpayer had presented empirical evidence to show that, across the industry, the processing allowance was likely to exceed nonrecoverable expenses for the tax years at issue. In answer to the Commissioner's objection that the taxpayer had not shown anything more than an accidental relationship between the processing allowance and the nonrecoverable expenses, the Court of Appeals stated:

At bottom, the Commissioner's argument is that the type of quantitative, empirical evidence presented in this case is not relevant to the creditability inquiry. However, the language of § 1.901–2—specifically, "effectively compensate" and "approximates, or is greater than"—suggests that quantitative empirical evidence may be just as appropriate as qualitative analytic evidence in determining whether a foreign tax meets the net income requirement. We therefore hold that empirical evidence of the type presented in this case may be used to establish that an allowance effectively compensates for nonrecoverable expenses within the meaning of § 1.901–2(b)(4). [*Id.* at 216; fn. ref. omitted.]

The Court of Appeals concluded:

Given the large size and representative nature of the sample considered, these statistics suffice to show that the Tax Court did not clearly err in finding that the processing allowance was likely to exceed nonrecoverable expenses for the tax years at issue. Texasgulf has therefore met its burden of proving that the predominant character of the OMT * * * is such that the processing allowance effectively compensates for any nonrecoverable costs. [*Id.* at 215–216.]

In reaching their decisions, both the Court of Appeals and this Court distinguished *Inland Steel Co. v. United States*, *supra* (which held the same OMT to be noncreditable). The former distinguished that case on the ground that it was decided before the promulgation of section 1.901–2, Income Tax Regs., and, in particular, before the adoption of the rule that a foreign tax law that "provides allowances that effectively compensate for non-recovery of * * * significant costs or expenses * * * is considered to permit recovery of such costs and expenses." Texasgulf II, 172 F.3d at 216–217. We distinguished *Inland Steel* not only on that ground but also on the ground that the case was governed by the "predominant character" test, which replaced the "substantial equivalence" test under which *Inland Steel* was decided. Texasgulf I, 107 T.C. at 69–70. In reaching that conclusion we stated that use of the "predominant character" and "effectively com-

pensates" tests represented "a change from the history and purpose approach used in cases decided before the 1983 regulations applied a factual, quantitative approach." *Id.* at 70.

In *Exxon Corp. v. Commissioner*, 113 T.C. 338 (1999), we considered the creditability of the U.K. petroleum revenue tax (PRT) under section 901 and the 1983 regulations. We found that a purpose of the PRT was "to tax extraordinary profits of oil and gas companies relating to the North Sea." *Id.* at 344. With limited exceptions, the tax base subject to PRT was gross income relating to oil and gas recovery activities less "all significant costs and expenses, except interest expense". [14] *Id.* at 345. In lieu of an interest expense deduction, the law provided a deduction for "uplift"; i.e., "amounts equal to 35 percent of most capital expenditures relating to a North Sea field". *Id.* at 347.

With respect to the predominant character of the tax, we found: "The purpose, administration, and structure of PRT indicate that PRT constitutes an income or excess profits tax in the U.S. sense." *Id.* at 356. We stated that the evidence at trial showed "that special allowances and reliefs under PRT significantly exceed the amount of disallowed interest expense for Exxon and other oil companies", and we quoted the testimony of the U.K. Government official who first presented PRT to the U.K. House of Lords for formal consideration that "'of course, this tax [PRT] represents an excess profits tax.'" *Id.* at 357. We rejected as irrelevant the Commissioner's contention that a company-by-company analysis showed that most of the companies operating in the North Sea did not have uplift allowance greater than or equal to the disallowed interest expense, and we agreed with Exxon that the "PRT was designed to tax excess profits from North Sea oil and gas production[,] which generally were earned by major oil and gas companies[,] which owned the largest and most profitable fields in the North Sea." *Id.* at 359. We then noted that the vast majority of those companies "had uplift allowance in excess of nonallowed interest expense." [15] *Id.* Finally, we concluded that "the predominant

---

[14] The denial of a deduction for interest was designed to prevent the use of intercompany debt to avoid or minimize liability for the tax. *Exxon Corp. v. Commissioner*, 113 T.C. 338, 345 (1999).

[15] Earlier in *Exxon Corp. v. Commissioner*, *supra* at 352, in discussing the predominant character standard, we made the following observation regarding sec. 1.901–2, Income Tax Regs.:

The regulations * * * provide that taxes either are or are not to be regarded as income taxes

character of PRT constitutes an excess profits or income tax in the U.S. sense" creditable under section 901. *Id.*

B. *Arguments of the Parties*

1. *Petitioner's Arguments*

Petitioner argues that, given the historical development, design, and actual operation of the windfall tax, it constitutes a creditable tax on excess profits.

Petitioner rejects respondent's view that, in determining the creditability of the windfall tax, we are constrained by the text of the statute. Rather, petitioner argues that we may consider extrinsic evidence of the purpose and effect of the tax as applied to the windfall tax companies. As petitioner states: "The determination of whether a foreign tax is designed to fall on some net gain or profit depends on the substance, and not the form or label, of the tax." In support of its position, petitioner relies, in large part, on the decisions of this Court in *Exxon Corp. v. Commissioner*, *supra*, Texasgulf I, and *Phillips Petroleum Co. v. Commissioner*, 104 T.C. 256 (1995), in each of which we considered evidence of the purpose, design, and operation of the foreign tax in question in considering creditability.

With respect to the development and design of the tax, petitioner offers the trial testimony of Professor Littlechild, two members of the Andersen team (Mr. Osborne and Dr. Wales), and an exhibit constituting Mr. Robinson's trial testimony in *Entergy Corp. v. Commissioner*, T.C. Memo. 2010–198, filed today, which also involves the creditability of the windfall tax. Petitioner notes that Professor Littlechild's testimony establishes that he designed the regulatory system (RPI – X) that allowed the privatized utilities to realize the higher-than-anticipated profits during the initial period after flotation. Petitioner also notes that both Mr. Osborne and Dr. Wales (members of the Andersen team who testified as experts regarding the regulatory and political concerns that led to enactment of the windfall tax) stated that (1) the

in their entirety for all persons subject to the taxes. See sec. 1.901–2(a), Income Tax Regs. Respondent does not interpret this provision as requiring that, in order to qualify as an income tax, a tax in question must satisfy the predominant character test in its application to all taxpayers. Rather, respondent interprets this provision as requiring that in order to qualify as an income tax a tax must satisfy the predominant character test in its application to a substantial number of taxpayers.

rationale for the tax was the perceived excess profits the privatized utilities earned during the initial period and (2) the actual form of the tax was adopted for "presentational" reasons. [16] Mr. Robinson's testimony in *Entergy* is consistent with that of Mr. Osborne and Dr. Wales, and it reaches the same principal conclusion: The intent was to tax the excess profits of the privatized utilities.

Petitioner also offers the testimony of Mark Ballamy (Mr. Ballamy) and Edward Maydew (Professor Maydew), both experts in accounting, the former the founder of a U.K. accounting firm, the latter a professor of accounting at the University of North Carolina. Petitioner claims that the sum and substance of Mr. Ballamy's testimony (which dealt with U.K. financial accounting concepts under the windfall profits tax statute) "establishes that the windfall tax fell on the excess profits of the Windfall Tax Companies during their initial periods and that all of these profits represented realized profits". Professor Maydew testified regarding U.K. and U.S. financial accounting concepts and that the windfall tax was, in substance, a tax on income, similar in operation to prior U.S. and U.K. excess profits taxes. Petitioner claims that Professor Maydew's testimony confirms that of Mr. Ballamy that the U.K. and U.S. concepts of realization are fundamentally the same, thereby satisfying the regulations' realization requirement.

Petitioner's final expert witness was Stewart C. Myers (Professor Myers), professor of finance at MIT's Sloan School of Management. Professor Myers' research and teaching focus is, in part, on the valuation of real and financial assets. Petitioner points to Professor Myers' testimony that the differences in windfall tax payments by the privatized companies cannot be explained by differences in flotation value or by changes in value after flotation and that the tax "operated as an excess-profits tax, not as a tax on value, change in value or undervaluation." [17]

---

[16] Dr. Wales testified that, during a Nov. 6, 1996, meeting with Gordon Brown, the Andersen team "demonstrated the presentational linkage that could be made between the mechanics of the tax, * * * the underlying rationale for the tax [i.e., a tax on the privatized utilities' initial period excess profits] and the popular notion of undervalue at privatisation."

[17] As part of his testimony, Professor Myers employed a series of scatter plot diagrams to demonstrate that there was, at best, a very loose relationship between the windfall tax the privatized utilities paid and changes in their actual market values after privatization, but very tight and direct relationships between (1) the windfall tax payments and the cumulative initial period earnings of those companies and (2) the windfall tax payments and what Professor

Petitioner also offered the fact testimony of Mr. Oösthuizen, SWEB's treasurer during the period leading up to the enactment of the windfall tax in 1997 and, before that, SWEB's tax manager. Mr. Oösthuizen recognized that, under the windfall tax formula, for every pound that profits were reduced in an initial period year, SWEB received 51 percent of that amount back as a reduction in its windfall tax liability. He also was involved in SWEB's decision to act on that knowledge by obtaining permission from its auditors (and, after an initial objection, Inland Revenue) to restate its accounts for its 1994–95 fiscal year (the final year of SWEB's initial period) by expensing (as a reserve) £12 million of projected tree-trimming costs, which saved SWEB over £6 million of projected windfall tax. [18] Petitioner also notes Mr. Oösthuizen's recognition that the windfall tax operated as an excess profits tax. In that regard, Mr. Oösthuizen testified as follows:

In effect, the way the tax works is to say that the amount of profits you're allowed in any year before you're subject to tax is equal to one-ninth of the flotation price. After that, profits are deemed excess, and there is a tax. That's how the tax works. It has a definition of what is allowable profit and what is excess profits, and it taxes the excess.

Lastly, petitioner notes that it is possible to restate the windfall tax formula algebraically to make clear that it operates as an excess profits tax imposed (on 27 of the 32 windfall tax companies) at an approximately 51.7-percent rate. [19] In that regard, petitioner points to a series of stipulations in

_____

Myers determined to be the cumulative initial period excess profits of the RECs and the WASCs.

Professor Myers also testified that the term "value in profit-making terms", as defined in the windfall tax statute, is not a standard economic term or concept and it has no meaning in any other context. Moreover, he believes that it does not represent a true economic value of any of the privatized utilities; rather, he believes that it constituted "a one-off device created to determine tax liability." He further testified:

The privatized companies were valued daily on the London Stock Exchange. The designers of the Windfall Tax could have used stock-market values to identify (with hindsight) the "undervaluation" of the companies on or after their IPO dates. Instead they settled on a formula in which the chief moving part was not value but profits.

Professor Myers rejects respondent's argument (discussed *infra*) that value in profit-making terms, because it is calculated using a reasonable price-to-earnings multiple, is the product of an acceptable valuation technique. In Professor Myers' view, "9 is not an accurate P/E multiple, and it is not applied to current or expected future earnings * * * [Therefore,] 'value-in-profit-making terms' cannot measure the economic value that companies could, would, or should have had."

[18] Mr. Oösthuizen testified that a Government press release describing the windfall tax prompted SWEB to restate its accounts for its 1994–95 fiscal year.

[19] Mr. Oösthuizen and Professors Maydew and Myers make the same point.

which the parties agree that that is in fact the case.[20] In particular, petitioner points to the parties' stipulation that the windfall tax formula (for companies with a full 1,461-day initial period) can be rewritten pursuant to the following steps (where P is the total initial period profits and FV is the flotation value).

*Statutory Windfall Tax Formula*

Tax = 23% × [{(365 × (P/1,461)) × 9} − FV]

*Windfall Tax Formula—Modification (1)*

Tax = 23% × [{(P/4 [21]) × 9} − FV)]

*Windfall Tax Formula—Modification (2)*

Tax = 51.71% × {P − (44.47% × FV)} [22]

Petitioner also points out that, instead of a cumulative reformulation of the windfall tax for the entire initial period, the tax can be reformulated by showing its application with respect to each year of that period as follows (where $P_1$, $P_2$, etc. represent profits for year 1, year 2, etc.).

$$
\begin{aligned}
\text{Tax} = {} & 51.71\% \times \{P_1 - (11.11\% \times \text{FV})\} \\
& + 51.71\% \times \{P_2 - (11.11\% \times \text{FV})\} \\
& + 51.71\% \times \{P_3 - (11.11\% \times \text{FV})\} \\
& + 51.71\% \times \{P_4 - (11.14\% \times \text{FV})\} \, [23]
\end{aligned}
$$

Petitioner argues that the foregoing mathematical and algebraic reformulations of the windfall tax as enacted show that, in substance, it was a tax imposed at a 51.71-percent rate "on the profits for each Windfall Tax company's initial period to the extent those profits exceeded an average annual

---

[20] Respondent objects to certain of those stipulations on the ground that the reformulations are neither (1) "the statutory equivalent of the equation set forth in the [Windfall Tax] Act" nor (2) "an appropriate application of the equation in the Act", and on the further ground that the stipulations are "irrelevant and immaterial." Respondent does not object to the mathematical equivalence of the reformulations.

[21] For the sake of simplicity here and in modification (2), 1,461 days divided by 365 days is deemed to equal 4 rather than the more accurate 4.0027397.

[22] Again, for the sake of simplicity, 44.47 percent represents (1,461/365)/9 or approximately 0.4447489 (which is approximately 4/9), and the 51.71 percent represents {9/(1,461/365)} × 23 percent or approximately 0.5171458 (which is approximately 9/4 of the 23-percent windfall tax rate). As Professor Myers points out, to get from modification (1) to modification (2), one need only multiply all terms inside the brackets (in modification (1)) by 4/9 and the 23 percent tax rate by 9/4 with the windfall tax amount remaining unchanged, because (4/9) × (9/4) = 1.

[23] The 11.14 percent reflects the multiplier for the leap year of 366 days, assumed, for demonstrative purposes, to be year 4.

return of approximately 11.1 percent of [the company's flotation value]."

Petitioner acknowledges, and the parties have stipulated (with respondent lodging the same objections regarding lack of statutory equivalency, appropriateness, relevancy, and materiality), that 5 of the 32 windfall tax companies had initial periods longer or shorter than 1,461 days and that, for those companies, the reformulated rates are different. For two of those companies, because the number of days in the initial period was very close to 1,461 days, the rate of the reformulated windfall tax was very close to 51.71 percent, and the 4-year return on flotation value to be exceeded for there to be a tax was very close to 44.47 percent. For NIE, which had an initial period of 1,380 days, those two rates were 54.75 percent and 42.01 percent, respectively. As noted *supra*, British Energy had no windfall tax liability because of insufficient profits during the initial period. The fifth company, Railtrack, had an initial period of only 316 days, with the result that the effective tax rate on its excess profits (determined pursuant to the stipulated reformulation of the tax) was 239.10 percent, and the cumulative 4-year return on flotation value to be exceeded for there to be a tax was only 9.62 percent. Petitioner dismisses any concerns regarding the effect of the reformulated windfall tax on those 5 companies as compared to its uniform effect on the other 27 companies on several grounds: (1) For 2 of the companies, the differences are negligible; (2) any differences in effective rates "are not significant or material in evaluating the overall incidence of the Windfall Tax" because the 5 companies are outliers and, therefore, must be ignored for purposes of determining creditability under the section 901 regulations as applied by the Court of Appeals for the Second Circuit in Texasgulf II and this Court in Texasgulf I; (3) as Mr. Osborne explained, the payment of relatively large amounts of windfall tax by companies with initial periods of substantially less than 1,461 days (i.e., NIE and Railtrack) was not a problem because profits earned over the balance of what would have been a full 1,461-day period (referred to by Mr. Osborne as "out performance") would not be subject to the tax; and (4) the tax did not exceed the realized, after-tax profits of any of the windfall tax companies.

2. *Respondent's Arguments*

Respondent argues that the 1983 regulations alone control the creditability of the windfall tax because those regulations subsume or supersede prior caselaw and "neither require nor permit inquiry into the purpose underlying the enactment of a foreign tax or the history of a foreign taxing statute." Applying those regulations to this case, respondent concludes that, according to the actual terms of the windfall tax statute, the windfall tax failed to satisfy any of the tests that a foreign tax must satisfy to be considered "likely to reach net gain in the normal circumstances in which it applies"; i.e., the realization, gross receipts, and net income tests. Therefore, the windfall tax did not have the predominant character of an income tax in the U.S. sense. In essence, respondent's position is that, pursuant to the terms of the statute, the windfall tax "was not imposed upon or after the occurrence of a realization event for U.S. tax purposes because the * * * tax was not a direct additional tax on pre-viously-realized earnings. Rather, the tax was imposed on the difference between two company values." As a tax imposed on a base equal to the unrealized difference between two defined values, rather than directly on realized gross receipts reduced by deductible expenses, respondent argues that it necessarily fails to satisfy any of the three tests.

Respondent flatly rejects petitioner's claim that, under the 1983 regulations, we may rely on extrinsic evidence "relating to * * * [the Windfall Tax's] purported purpose, design, and 'substance' revealed through petitioner's so-called 'algebraic reformulation' of the tax." Respondent argues that Texasgulf II, Texasgulf I, and *Exxon Corp. v. Commissioner*, 113 T.C. 338 (1999), which did admit extrinsic evidence to dem-onstrate the creditability of foreign taxes, should be limited to their facts; i.e., a finding that the alternative cost allow-ances under consideration in those cases "effectively com-pensated" for the nondeductibility of certain actual expenses pursuant to the requirements of section 1.901–2(b)(4)(i)(B), Income Tax Regs., and "do not support the use of extrinsic evidence to satisfy a requirement not found in the regula-tions."

Respondent also argues that we should disregard peti-tioner's algebraic reformulations of the windfall tax statute

as merely "a hypothetical rewrite" of the statute, which does not constitute "'quantitative' or 'empirical' evidence" that the tax actually touched net gain, "as contemplated by this Court in *Texasgulf I* or *Exxon*." That argument, like his argument that we may not consider extrinsic evidence that the actual incidence of the tax was on net income or excess profits, follows from what appears to be the crux of respondent's position: The windfall tax is unambiguously imposed on the difference between two values and, therefore, it cannot be a tax on income or profit.[24]

Because for respondent "the 'substance' of the tax is revealed on the face of the Windfall Tax statute itself"—i.e., "[t]he words of the U.K. statute *are* the 'substance' of this tax"—he believes that it is not necessary to look beyond those words to give them meaning. Nevertheless, he argues that, even assuming the intent of the Andersen team and members of Parliament might be relevant in characterizing the nature of the windfall tax, their intent is as consistent with the statute as written (i.e., a tax on value in excess of flotation proceeds) as it is with petitioner's view that the windfall tax was intended as a tax on excess profits. In support of that argument, respondent refers to Mr. Robinson's 2000 book describing his life as a member of the Labour Party, entitled "The Unconventional Minister", and quotes the following portion of chapter 6, which describes the development and enactment of the windfall tax:

> Then in October 1996 Chris Wales had a stroke of inspiration. Chris simply turned the whole argument on its head: the problem was not that the companies had made too much profit, nor that they had paid out too much to shareholders and fat-cat directors, nor that they had been treated with kid gloves by the regulators. That was all true of course: but the genesis of the problem was that they had been sold too cheaply in the first place. Why not then, argued Chris, tax the loss to the taxpayer which arose from the sale of these companies at what was a knock-down price.

In further support of his position that the windfall tax was indeed a tax on the difference between two defined values, respondent offers the expert testimony of Peter K. Ashton (Mr. Ashton), a consultant who was qualified as an expert in economics and valuation methodologies, and Philip Baker QC

---

[24] Respondent makes the point on brief as follows: "The key evidence in this case—the Windfall Tax statute itself—explicitly provides that the Windfall Tax is imposed on a base of the difference between two values, and such formulation fails to satisfy the section 901 regulations."

(Queens Counsel; Mr. Baker), a U.K. tax lawyer offered as an expert in U.K. tax legislation and the U.K. tax system.

Mr. Ashton viewed the method of computing the statutory value in profit-making terms for each of the windfall tax companies as a generally accepted valuation methodology, which he referred to as the "market value multiples method for computing the equity value of a company." Although Mr. Ashton agreed that, in general, "valuation is a forward-looking proposition", he reasoned that the windfall tax methodology of fixing value retroactively was acceptable because the draftsmen selected a valuation date with respect to which they had "perfect foresight of what the income is going to be for * * * [the windfall tax companies] that you can plug in to the valuation formula."

The substance of Mr. Baker's testimony was that, by its terms, the windfall tax was for each windfall tax company a tax on a tax base equal to the difference between two defined values, and that, as such, it was distinguishable from prior or existing U.K. taxes on excess profits or capital gains.

Respondent echoes Mr. Baker's view that the windfall tax was intentionally imposed on a tax base measured, in part, by a value (the "value in profit-making terms") derived (retrospectively) from known initial period earnings and, for that reason, criticizes Professor Myers' reliance on "equity value or market capitalization value" as his standard for concluding that, in relying on "value in profit-making terms", the windfall tax was not a tax on value, as that term is conventionally understood. In respondent's view, we "need not determine whether the Profit-Making Value formula resulted in a 'realistic' valuation of the Windfall Tax Companies in order to determine whether the Windfall Tax is a creditable tax." That is because, in respondent's view, profit-making value "represented a reasonable approximation of how the Windfall Tax Companies might have been valued at the time of flotation if subsequent earnings could have been known at that time." [25]

[25] Relying on a point that the Andersen team made in a November 1996 presentation to Gordon Brown, respondent also argues, presumably as an alternative ground for denying a foreign tax credit for the windfall tax, that the tax was, in substance, a reenactment of TCGA sec. 179 (see the discussion of that provision in note 3 of this report); i.e., a retroactive tax on the unrealized appreciation of the windfall tax companies at the time of privatization. Respondent argues that, because the tax necessarily fails the realization test of the 1983 regulations, it is noncreditable. We find respondent's arguments unpersuasive for two reasons. First, respondent's own

### C. *Analysis*

### 1. *Introduction*

The parties fundamentally disagree as to what we may consider in determining whether the windfall tax is a creditable tax for purposes of section 901. Respondent's view is that we need not (indeed, may not) consider anything other than the text of the windfall tax statute in determining whether that tax is an "income tax" within the meaning of section 1.901–2(a), Income Tax Regs. "[B]ased on * * * the simple formula employed to levy the tax", respondent argues, the windfall tax falls on the difference between two values— "Flotation Value" and "Profit-Making Value". It is, respondent continues, therefore a tax on value (and not on income). "Petitioner", respondent concludes, "cannot escape from the plain language of the [windfall tax] statute."[26]

Petitioner, points out that, under the cited regulation, it is the "predominant character" of the foreign tax in question that counts. To determine the predominant character of the windfall tax, petitioner argues that we may consider evidence beyond the text of the statute; viz, evidence of the design of the tax and its actual economic and financial effect as it applies to the majority of the taxpayers subject to it. In support of that argument, petitioner principally relies on three cases this Court has decided since the promulgation of the 1983 regulations: *Exxon Corp. v. Commissioner*, 113 T.C. 338

---

expert, Mr. Baker, specifically disavowed those arguments by flatly stating that the windfall tax "was not corporation tax. It was a separate tax and it was at the rate of 23 percent instead [of the 33 percent corporate tax rate]." Second, we agree with petitioner that, even if the windfall tax had been intended as (in substance) a reenactment of TCGA sec. 179, it would not be a tax on unrealized appreciation; rather it would be a tax on previously realized but unrecognized gain and, therefore, creditable. As petitioner points out: "the operation of section 171 TCGA and section 179 TCGA is substantively similar to the gain deferral and recognition rules relating to intercompany transfers in our consolidated return regulations, section 1.1502–13, Income Tax Regs." Petitioner argues, however, that "[t]he Windfall Tax statute was not designed on the basis of Section 179 TCGA. Respondent's argument on this basis is unfounded." We accept what is, in effect, petitioner's concession that the windfall tax should not be considered an income tax because it resembled, or was a reinstatement of, TCGA sec. 179. Therefore, we do not decide the windfall tax issue on that ground.

[26] "In construing a statute", respondent argues, "the 'preeminent canon of statutory interpretation requires a court to "presume that [the] legislature says in a statute what it means and means in a statute what it says there."'" (quoting *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) (quoting *Conn. Natl. Bank v. Germain*, 503 U.S. 249, 253–254 (1992))). Respondent insists that "'when the statute's language is plain, "the sole function of the courts"—at least where the disposition required by the text is not absurd—"is to enforce it according to its terms."'" (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989)).

(1999), Texasgulf I, and *Phillips Petroleum Co. v. Commissioner*, 104 T.C. 256 (1995).

For the reasons that follow, we think that petitioner has the better argument, and we find that the windfall tax is a creditable income tax under section 901.

2. *Nature of the Predominant Character Standard*

Respondent's text-bound approach to determining the creditability of the windfall tax is inconsistent with the 1983 regulations' description of the predominant character standard for creditability under which "the predominant character of a foreign tax is that of an income tax in the U.S. sense * * * [i]f * * * the foreign tax is likely to reach net gain in the normal circumstances in which it applies". Sec. 1.901–2(a)(3)(i), Income Tax Regs. By implicating the circumstances of application in the determination of the predominant character of a foreign tax, the drafters of the 1983 regulations clearly signaled their intent that factors extrinsic to the text of the foreign tax statute play a role in the determination of the tax's character. In determining the predominant character of a foreign tax, we may look to the actual effect of the foreign tax on taxpayers subject to it, the inquiry being whether the tax is designed to and does, in fact, reach net gain "in the normal circumstances in which it applies", regardless of the form of the foreign tax as reflected in the statute.

That interpretation of the regulations' predominant character standard is consistent with caselaw preceding the issuance of the 1983 regulations and, in particular, two of the cases cited in the preamble to those regulations as providing the "criterion for creditability" embodied in that standard: *Inland Steel Co. v. United States*, 230 Ct. Cl. 314, 677 F.2d 72 (1982), and Bank of America I (see *supra* p. 321 of this report). In the former case, the Court of Claims stated that a foreign tax will qualify as an income tax in the U.S. sense if the foreign country has "made an attempt always to reach some net gain in the normal circumstances in which the tax applies. * * * The label *and form* of the foreign tax is not determinative." *Inland Steel Co. v. United States*, *supra* at 325, 677 F.2d at 80 (emphasis added). The court noted that the issue, as framed under its analysis in Bank

of America I, is "whether taxation of net gain is the ultimate objective *or effect* of * * * [the foreign] tax." *Id.* at 326, 677 F.2d at 80 (emphasis added). In Bank of America I, 198 Ct. Cl. at 274, 459 F.2d at 519 (emphasis added), the Court of Claims stated: "The important thing is whether the other country is attempting to reach some net gain, *not the form in which it shapes the income tax or the name it gives*."

The facts and analysis of the Court of Claims in Bank of America I nicely illustrate the prevailing pre-1983 standard. The case involved in part the creditability of foreign taxes on the taxpayer's gross income from the banking business its branch conducted in each of certain foreign countries. Clearly, a gross income tax is not, by its terms, a net income tax. Had the Court of Claims focused solely on the statutory language, which, in each case, levied a tax on the taxpayer's "gross takings" or "gross receipts" before deduction of any expenses, it would have been compelled to hold, on that ground alone, that none of the taxes under consideration constituted a creditable net income tax. The focus of the court's inquiry, however, was not on the text of the statute per se, but on the question of whether the tax was "attempting to reach some net gain". *Id.* The court specifically noted that "a levy can in reality be directed at net gain even though it is imposed squarely on gross income." *Id.* Relying on prior judicial decisions, Internal Revenue Service rulings, and gross income tax levies under Federal law (e.g., sections 871 and 1441), the court concluded that an income tax under section 901 "covers all foreign income taxes designed to fall on some net gain or profit, and includes a gross income tax if, but only if, that impost is almost sure, or very likely, to reach some net gain because costs or expenses will not be so high as to offset the net profit." *Id.* at 281, 459 F.2d at 523.[27] Because the gross income taxes in Bank of America I failed to meet that test, the court held that they were noncreditable. *Id.* at 283, 459 F.2d at 524–525.

Also, as noted *supra*, the cases that have applied the 1983 regulations' predominant character standard are consistent with the Court of Claims' approach to creditability in *Inland Steel* and Bank of America I. Thus, in Texasgulf I, and in

---

[27] As noted *supra* note 12, the Court of Claims' test for the creditability of a gross income tax is incorporated into the 1983 regulations. See sec. 1.901–2(b)(4)(i), Income Tax Regs.

*Exxon Corp. v. Commissioner*, *supra*, we relied on quantitative, empirical evidence of the actual effect of the foreign tax on a majority of the taxpayers at whom it was directed and found that, in each case, the tax was designed to, and did, in fact, reach net gain and, therefore, constituted a creditable income or excess profits tax. In Texasgulf I, we distinguished the result in *Inland Steel Co. v. United States*, *supra*, which had held the tax under consideration (the Ontario Mining Tax) to be noncreditable, stating: "The use of the 'predominant character' and 'effectively compensates' tests in section 1.901–2(b)(4), Income Tax Regs., is a change from the history and purpose approach used in the cases decided before *the 1983 regulations applied a factual, quantitative approach*." Texasgulf I, 107 T.C. at 70 (emphasis added).

We reject respondent's argument that this Court, in Texasgulf I and *Exxon*, and the Court of Appeals for the Second Circuit, in Texasgulf II, "strictly limit the use of empirical data to an analysis under the alternative cost recovery method of the net income requirement of * * * [section 1.901–2(b)(4)(i)(B), Income Tax Regs.]." It is true that Texasgulf I, Texasgulf II, and *Exxon* involved the creditability of foreign taxes that started with a statutory tax base consisting of gross income, and that all three relied on extrinsic evidence to show that the foreign law's allowances in lieu of deductions for expenses actually incurred would "effectively compensate for nonrecovery of * * * significant costs or expenses", as required by section 1.901–2(b)(4)(i), Income Tax Regs. We disagree, however, with respondent's conclusion that those cases "do not support the use of extrinsic evidence to satisfy a requirement not found in the regulations." Nothing in those cases would so limit a taxpayer's right to rely on extrinsic evidence to demonstrate the creditability of a foreign tax and, specifically, that it satisfied the predominant character standard. In Texasgulf I, Texasgulf II, and *Exxon*, the narrow issue was whether the statutory allowances in question did, in fact, "effectively compensate" for the nondeductibility of "significant costs or expenses" within the meaning of section 1.901–2(b)(4)(i), Income Tax Regs. But the overall issue for decision in those cases, as in this case, was whether the foreign tax was designed to and did, in fact, reach net gain. The only limitation on reliance on extrinsic

evidence in any of the three opinions in those cases is the following observation by the Court of Appeals for the Second Circuit in Texasgulf II, 172 F.3d at 216 n.11:

We note, however, that this case is exceptional, in that the relatively small number of taxpayers subject to the OMT made it practicable to compile and present broadly representative industry data spanning a lengthy period. We do not suggest that the reliance that we place on empirical evidence would be appropriate in cases where such comprehensive data is unavailable.

Far fewer taxpayers were subject to the windfall tax than were subject to OMT in Texasgulf II, and the data (after-tax financial profits)[28] for the taxpayers subject to the windfall tax were readily available in the published financial reports of those taxpayers.

Respondent's argument that we should restrict our inquiry to the text of the windfall tax to determine its predominant character is unpersuasive.

3. *The Predominant Character Standard as Applied to the Windfall Tax*

The term "value" may mean, among other things, either "Monetary or material worth" or, in mathematics, "An assigned or calculated numerical quantity." The American Heritage Dictionary of the English Language 1900 (4th ed. 2000). The parties do not disagree that the amount of the windfall for purposes of determining the windfall tax is, in mathematical terms, the excess (if any) of one value (value in profit-making terms) over another (flotation value). Nor do they disagree that flotation value is real or actual value (a value in the first sense). They do disagree as to whether value in profit-making terms is a real or actual value. Relying on its experts' testimony, petitioner argues that it is

[28] Although respondent states that "[t]he use of financial book earnings, rather than 'taxable income,' in determining the Windfall Tax Companies['] Profit-Making Value further distinguishes the Windfall Tax from a U.S. excess profits tax", he does not argue that a foreign tax on financial profits is noncreditable for that reason alone. That argument would appear to be invalid, in any event, in the light of our own corporate alternative minimum tax, which at one time was calculated, in part, using financial or book earnings. See sec. 56(f), repealed in 1990 by the Omnibus Budget Reconciliation Act of 1990, Pub. L. 101–508, sec. 11801(a)(3), 104 Stat. 1388–520. Moreover, differences between book and taxable income are, with rare exception, attributable to timing differences, which are generally disregarded under the 1983 regulations. See sec. 1.901–2(b)(4)(i), Income Tax Regs.

not "a real economic value". [29] We need not settle that dispute because, even were we to agree with respondent that value in profit-making terms is a real or actual value, that would not necessarily be determinative since our inquiry as to the predominant character of the windfall tax is not text bound. Indeed, however we describe the form of the windfall tax base, our inquiry as to the design and incidence of the tax convinces us that its predominant character is that of a tax on excess profits. As an initial matter, we note that the parties have stipulated that none of the 31 companies that paid windfall tax had a windfall tax liability in excess of its total profits over its initial period.

With respect to design, respondent reorders the usual notion (at least in architecture) that form follows function to argue, in essence, that form determines function; i.e., that the design of the tax base (the excess of one value over another) demonstrates Parliament's decision to enact a tax based on value (i.e., "to tax undervaluation on flotation of the Windfall Tax Companies") "rather than a tax based on income or excess profits." We disagree.

Gordon Brown's public statements in his July 2, 1997, Budget Speech, the Inland Revenue and U.K. Treasury announcements, and the debate in Parliament preceding enactment of the windfall tax make clear that the tax was justified for two essentially equivalent reasons: (1) It would recoup excessive profits earned by the privatized utilities during the initial period, and (2) it would correct for the undervaluation of those companies at flotation. The reasons are equivalent because each subsumes the other. That is the essence of the explanation of the windfall tax by Her Majesty's Treasury in its 1997 publication entitled "Explanatory Notes: Summer Finance Bill 1997":

The profits made by these companies in the years following privatisation were excessive when considered as a return on the value placed on the companies at the time of their privatisation by flotation. This is because the companies were sold too cheaply and regulation in the relevant periods was too lax.

---

[29] Mr. Osborne, one of petitioner's expert witnesses and a member of the Andersen team involved in designing the windfall tax, testified that value in profit-making terms "is not a real value: it is rather a construct based on realised profits that would not have been known at the date of privatisation, and a mechanism by which additional taxes on profits could be levied."

Thus, profits were considered excessive in relation to the prices at which the windfall tax companies were sold to the public, which, in turn, were deemed to be too low.[30] One explanation implies the other. It follows, then, that both parties may be said to be correct in their assessment of the political motivation for the windfall tax.

Of greater significance, in terms of the creditability of the windfall tax, is the fact that the members of Parliament understood that they were enacting a tax that, by its terms, represented one of two equivalent explanations. That understanding is evidenced by the Conservative Party Shadow Chancellor of the Exchequer's, Mr. Lilley's, recognition that the Government had "taken average profits over four years after flotation" and "[i]f those profits exceed one ninth of the flotation value, the company will pay windfall tax on the excess." Mr. Lilly's understanding that the windfall tax could be characterized as a tax on excess profits is further indicated by his recognition that privatized utilities "that failed to improve their profitability over * * * [the initial period] will pay much less or even no windfall tax."

Just as "a levy can in reality be directed at net gain even though it is imposed squarely on gross income", Bank of America I, 198 Ct. Cl. at 274, 459 F.2d at 519, so too can a foreign levy be directed at net gain or income even though it is, by its terms, imposed squarely on the difference between two values.[31] And that is what we conclude in the

---

[30] That rather obvious point was also made by Mr. Osborne:

The rationale for the tax was rooted in * * * [the] initial period during which excessive profits were made, as judged against the companies' flotation values.

The nature of the judgment means that there is a logical symmetry between the two available ways of describing the rationale for the tax—that profits were high in relation to the flotation value, or that the flotation value was low in relation to profits. * * *

[31] A classic definition of income from the economic literature is squarely so based: "Income is the money value of the net accretion to one's economic power between two points of time." Haig, "The Concept of Income–Economic and Legal Aspects", The Federal Income Tax 7 (Columbia University Press 1921).

Robert M. Haig's definition was subsequently expressed by another economist, Henry C. Simons, in a way that explicitly included consumption: "Personal income may be defined as the algebraic sum of (1) the market value of rights exercised in consumption and (2) the change in value of the store of property rights between the beginning and end of the period in questions." Simons, Personal Income Taxation 50 (1938). The Simons refinement has come to be known as the Haig-Simons definition of income and is widely accepted by lawyers and economists. Graetz & Schenk, Federal Income Taxation, Principles and Policies 97 (6th ed. 2009).

A foreign tax imposed on a base conforming to the Haig-Simons definition of income, viz, (1) the value of savings at the end of the period plus consumption during the period minus (2) the value of savings at the beginning of the period, would seem to qualify as a tax on net gain under

Continued

case of the windfall tax. The architects and drafters of the tax knew (1) exactly which companies the tax would target, (2) the publicly reported after-tax financial profits of those companies, which were a crucial component of the tax base, [32] and (3) the target amount of revenue the tax would raise. Therefore, it cannot have been an unintentional or fortuitous result that, (1) for 29 of the 31 windfall tax companies that paid tax, the effective rate of tax on deemed annual excess profits was at or near 51.7 percent, [33] and (2) for none of the 31 companies did the tax exceed total initial period profits. What respondent refers to as "petitioner's algebraic reformulations of the Windfall Tax statute" do not, as respondent argues, constitute an impermissible "hypothetical rewrite of the Windfall Tax statute". Rather they represent a legitimate means of demonstrating that Parliament did, in fact, enact a tax that operated as an excess profits tax for the vast majority of the windfall tax companies. [34] The design of the windfall tax formula made certain that the tax would, in fact, operate as an excess profits tax for the vast majority of the companies subject to it. [35]

---

the 1983 regulations. That the tax base includes unrealized appreciation in property is no bar to such qualification. See sec. 1.901–2(b)(2)(i)(C), (iv) *Example (2)*, Income Tax Regs.

[32] SWEB's ability to reduce retroactively its reported profits for one of its initial period years appears to have been a solitary aberration among the windfall tax companies and does not detract from the general conclusion that the initial period financial profits of the windfall tax companies were known before enactment.

[33] Because it had an initial period of only 316 days, Railtrack presents the sole exception to the overall conclusion that the windfall tax, viewed as a tax on excess profits, affected the targeted companies in a reasonable manner. As noted *supra*, the effective tax rate on Railtrack's excess profits was 239.10 percent and the cumulative 4-year return on flotation value to be exceeded for there to be a tax was only 9.62 percent. It is clear, however, that neither the regulations nor the cases interpreting them require that the foreign tax mimic the U.S. income tax for all taxpayers to achieve creditability under sec. 901, only that it satisfy that standard "in the normal circumstances in which it applies". See sec. 1.901–2(a)(3)(i), Income Tax Regs. See also *Exxon Corp. v. Commissioner*, 113 T.C. at 352, in which we noted the Commissioner's acknowledgment that, "to qualify as an income tax a tax must satisfy the predominant character test in its application to a substantial number of taxpayers." In that case we found that the U.K. Petroleum Revenue Tax (PRT) provided a sufficient allowance in lieu of a deduction for interest expense where, for the 34 companies responsible for 91 percent of the PRT payments, the allowance exceeded nonallowed interest expense.

[34] Respondent describes petitioner's algebraic reformulation of the windfall tax as an attempt "to rewrite the value-based Windfall Tax to convert it into a profit-based tax." Presumably, respondent would agree that, had the tax been enacted as a "profit-based tax" instead of as a tax on the difference between two values, it would have been creditable. Under that approach, the same tax is either creditable or noncreditable, depending on the form in which it is enacted, a result at odds with the predominant character standard set forth in the regulations and applied in the caselaw.

[35] If, as respondent suggests, the real goal of the windfall tax was to recoup, on behalf of the public, the windfall to the initial investors that arose by virtue of flotation prices well below actual value (as perceived with hindsight), why did the Labour Party majority not try to recoup

Because both the design and effect of the windfall tax was to tax an amount that, under U.S. tax principles, may be considered excess profits realized by the vast majority of the windfall tax companies, we find that it did, in fact, "reach net gain in the normal circumstances in which it [applied]", and, therefore, that its "predominant character" was "that of an income tax in the U.S. sense." See sec. 1.901–2(a)(1), (3), Income Tax Regs.

We recognize that, in the cases that have either provided the foundation for the predominant character standard (e.g., *Inland Steel Co. v. United States*, 230 Ct. Cl. 314, 677 F.2d 72 (1982), and Bank of America I), or applied that standard (e.g., Texasgulf I, Texasgulf II, and *Exxon Corp. v. Commissioner*, 113 T.C. 338 (1999)), the tax base, pursuant to the statute, was a gross amount or a gross amount less expenses comprising, in part, allowances in lieu of actual costs or expenses, and the issue was whether the statutory tax base represented net gain for the majority of taxpayers subject to the foreign tax. Nevertheless, the analysis that led the courts in those cases (with the exception of *Inland Steel*)[36] to determine creditability or noncreditability of the foreign tax in issue is equally applicable in determining the creditability of the windfall tax, the question being whether, according to an empirical or quantitative analysis, the tax was likely to reach net gain in the normal circumstances in which it applied. Because the facts of this case provide an affirmative answer to that question, we find the windfall tax to be creditable.

---

the entire windfall or at least a substantial portion of it; i.e., why was the tax rate not 100 percent or something closer to it than the 23-percent rate actually imposed? Although there is no evidence in the record that would provide a direct answer to that question, we find the enactment of the relatively low 23-percent rate to be consistent with an awareness of the Labour Party that it was taxing the companies, not the investors who actually benefited from the allegedly low flotation prices, and a decision, on its part, that a tax on the companies, being, in effect, a second tax on their initial period profits, should be imposed at a reasonable, nonconfiscatory rate, which would be sufficient to raise the desired revenue. That view is, of course, consistent with petitioner's argument that the form of the tax was adopted for "presentational" reasons.

[36] As we noted in Texasgulf I, 107 T.C. at 71, the Court of Claims in *Inland Steel Co. v. United States*, 230 Ct. Cl. 314, 677 F.2d 72 (1982) "did not have industry-wide data to consider, and the Secretary had not yet promulgated regulations using a quantitative approach", and it held the Ontario Mining Tax to be noncreditable because it was not the "substantial equivalent" of an income tax, a standard for creditability that was modified by the 1983 regulations' adoption of the predominant character standard.

D. *Conclusion*

The windfall tax paid by petitioner's indirect U.K. subsidiary, SWEB, constituted an excess profits tax creditable under section 901.

II. *The Dividend Rescission Issue*

The parties submitted the dividend rescission issue fully stipulated. On brief, petitioner states that, if we resolve the windfall tax issue in its favor, then petitioner concedes the dividend rescission issue. Because we have done so, we need not address the dividend rescission issue. We accept petitioner's concession. [37]

III. *Conclusion*

Taking into account our prior Opinion in *PPL Corp. & Subs. v. Commissioner*, 135 T.C. 176 (2010),

> *Decision will be entered under Rule 155.*

---

[37] Petitioner argues that if we resolve the windfall tax issue in its favor, then SWEB Holdings would not have had sufficient earnings and profits to pay a taxable dividend. Any distribution by SWEB Holdings would thus constitute a nontaxable return of capital. On brief, petitioner states that the "tax consequences [of such a nontaxable return of capital] would not, in petitioner's judgment, be material." For that reason, "[i]n the interest of judicial economy", petitioner does not ask that we decide the dividend rescission issue in its favor if we decide the windfall tax issue in its favor.

APPENDIX

